# THE JOSEPHINE.

1. The case of the *Baigorry* (2 Wallace, 474), deciding that the blockade of the *coast* of Louisiana, having no direct communication with the port of New Orleans by navigation, was not terminated by the proclamation of May 12, 1862, discontinuing the blockade of that port—affirmed.
2. If a vessel is found without a proper license near a blockading squadron,

under circumstances indicating intent to run the blockade, and in such
a position as that if not prevented she might pass the blockading force,
she cannot thus, *flagrante facto*, set up as an excuse that she was seeking
the squadron with a view of getting an authority to go on her desired
voyage.

By proclamation of President Lincoln, in April, 1861, a
blockade was established along our whole Southern coast,
then in possession of rebels against the authority of the
Government. In the beginning of May, 1862, New Orleans
and certain forts, Fort Jackson, Fort St. Philip, Fort Wood,
Fort Pike, Fort Livingston, &c., passed, in consequence of
the successes of Flag-Officer Farragut, into the possession of
the Government, and from the 6th of May at latest, the pos-
session of New Orleans became complete. On the 12th of
May, 1862, the President issued his proclamation declaring
that the blockade of the *port of New Orleans* should so far
cease after the 1st of June, 1862, as that commercial inter-
course with it might be carried on.

On the 28th July, 1862, nearly two months after the date
last named, the Josephine was captured by the United States
steamer Hatteras, on the high seas, and brought into Phila-
delphia, where she was libelled as prize. A certain Quey-
rouze intervened, claiming the cargo as the property of a
French neutral, one Laplante, resident in France. He gave
this history of the vessel: That she was loaded in New Or-
leans in February, 1862, with intention to proceed to Havana
"as soon as the port of New Orleans should be captured and
opened by the forces of the United States;" that Laplante
intended to ship the cargo at Havana in another vessel for
Bordeaux; that he had written from Bordeaux to Quey-
rouze, at New Orleans, instructing him to load a vessel and
keep vessel and cargo there until the port was opened by
the United States authorities; that it had been expected
that an attack would be made on the city by the Govern-
ment forces, and, anticipating its capture, Laplante had
deemed it expedient to have a vessel loaded ready to leave
immediately upon the opening of the port; that Queyrouze
obeyed the instruction, and the vessel, having been loaded,

remained at the wharf of New Orleans until the investment
of the forts below the city, in April, 1862; that it then be-
coming evident the Federal forces would capture the city,
the rebel commander issued a proclamation commanding
the destruction of all vessels lying at New Orleans, with the
cotton, &c., on board, or in store for shipment; to avoid
which destruction the master of the Josephine caused her to
be towed into Bayou Chené, to a point in the interior, and
distant from New Orleans, where she lay concealed for a
long time; that the master meantime endeavored to com-
municate the true character of vessel and cargo and destined
voyage to the Federal authorities, that he might be brought
within their protection and licensed to proceed to Havana,
but was unable to do so because the rebel governor had pro-
hibited it by his proclamation; that about the 25th July,
1862, it having been reported that the rebel commander of
the district where she lay concealed designed to destroy the
vessel, the master managed to escape with his vessel and
cargo to the Gulf by some of the secret passages from the
body of the country to the Gulf with which that region
abounds; that he then sailed towards the mouth of the Mis-
sissippi, expecting to fall in with some of the United States
blockading squadron and obtain the license to proceed on
the intended voyage, but that on the 28th of July, 1862,
while hauling round Ship Shoal, in full view of the light-
house, she was captured.

The master of the vessel, a resident of New Orleans, gave
a different account; and swore in effect that the cargo be-
longed to other persons than Laplante, to wit: to certain
Frenchmen, including one Sixé, resident and doing business
in New Orleans; that he signed three bills of lading; that
the cargo was deliverable to one Cabuzac, of Havana, to
whom he was to go for orders, if he arrived there; that
there were no papers of the kind inquired of on board; that
is, no contract, agreement, license, protection, passport, or
sea-brief from any government or officer thereof, but that he
had a mail, containing letters, on board at the time of sail-
ing, which he was instructed by Mr. Sixé to destroy in case

of capture, and which he threw overboard in pursuance of his instructions, and that he gave up no papers to the captors, having none; that he sailed from New Orleans four days before the capture of that city by the United States forces, and took his vessel to Bayou Chené; that he got to sea on the 27th of July, 1862, *and was bound to some port in Cuba or wherever he could get his vessel;* and that he was captured on the 28th of July, 1862, off Ship Shoal light-house, bearing east-northeast, *about ten miles* from the light-house, sailing under the English flag, without having cleared at any custom-house.

The mate, also a resident of Louisiana, corroborated the master, so far as his knowledge extended; stating that they sailed from Bayou Botey, Louisiana, and *were bound for Havana;* that they sailed under the English flag, and that a

little before the capture the captain threw overboard a bundle of papers.   He presumed that the cause of the capture was the supposition that they had run the blockade.

Seacolor, a hand on board, said that the capture must have been because they had run the blockade.

The ship's papers found on board consisted only of some receipts for cotton, dated on the brig Josephine, from the 15th to the 19th of February, but without signature.

The map will show the peculiar character of the region in which the vessel was; a region which presents a reticulation of *bayous* interlacing with each other, in and through which it is possible to run from one portion of the country to another, in a manner rendering it almost impossible. to follow a course, which may be made devious to almost any extent.

Cargo and vessel were both condemned (no claimant appearing for the latter); and the case was now here for review; the main question considered by the court being whether the vessel had violated the blockade; though the condemnation was justified, also, on the ground of enemy's property.   A motion had been allowed, also, in this court, owing to certain special facts, to allow some further proofs.

*Mr. Assistant Attorney-General Ashton, and Mr. Coffey, special counsel for the captors.*

1. However owned, the ship was clearly captured whilst violating the blockade of the Louisiana coast, and was, with her cargo, liable to condemnation on that ground.

She left New Orleans, according to the master, four days before its capture by the United States forces, and when she was captured she was proceeding on the voyage then commenced.   The blockade of that port was not then raised or relaxed, and there can be no question that, when captured, she was *in delicto* for that offence.

But, after she left New Orleans, the vessel lay for some months in one of the bayous, which form the secure retreats of rebel blockade-runners in Southern Louisiana, where, by the admission of Queyrouze, *she was within the rebel lines and*

*control.* She sailed out from those lines on the 27th of July, and was captured on the 28th, off the coast, under a false flag, *on her way to Cuba.* The master says, bound to some port in Cuba; and the mate says, " bound to Havana."

At that time, the coast of Louisiana and its ports were blockaded, all being in rebel possession and control, except the port of New Orleans. The limited and conditional cessation of the blockade of New Orleans, allowed by the President's proclamation of 12th May, 1862, did not and could not apply to any other port of Louisiana, or to any portion of the coast in rebel possession and control. This was decided in *The Baigorry,*\* a year only ago. That *coast* was, at the date of capture, in a state of actual and lawful blockade, and the Josephine was taken in the act of breaking that blockade.

No evidence is necessary to fasten on the Josephine knowledge of the blockade, since she was sailing from a blockaded port. In the " *Prize Cases,*"† Mr. Justice Grier observed, that it is a settled rule in the law of nations, that a vessel in a blockaded port is presumed to have notice of the blockade as soon as it commences. But the claimant of this cargo must be charged with an actual knowledge, for he asserts, that at the time of capture the master of the Josephine was shaping his course for the blockading squadron. The offence was, therefore, complete.

In addition to its proved falsehood, the story of Queyrouze, that, at the time of the capture, the Josephine was seeking the blockading squadron to get a license or permission to proceed on her intended voyage, is subject to the further infirmity, that, if it were true, it would not relieve her from the penalty of blockade-running. No officer of the blockading squadron had any power to give such license or permission, and the law never accepts such an excuse from a vessel caught *in flagrante delicto.* It is of the class of excuses animadverted on by Sir William Scott, in *The Spes* and *The Irene,*‡ where vessels approached the mouth of a blockaded

\* 2 Wallace, 474.          † 2 Black, 677.          ‡ 5 Robinson, 77.

river, with pretence of making inquiry as to the blockade, if they fall in with blockading vessels, but with intent to slip into port if they escape such vessels.

But the absurdity of the pretence set up by the claimant, of seeking the blockading squadron for a license, is proved not only by the master's contradiction of it in the statement that he was bound to Cuba, but by the facts that he was sailing under a false flag, and just before capture destroyed his papers. These acts, by the well-settled rules of law, stamp the voyage as fraudulent, and sustain the allegation of the libel.

2. The evidence proves that the cargo was owned by residents of New Orleans doing business there, and enemies of the United States. Sixé was one owner, and it having been by his instructions that the papers were destroyed, every presumption will be raised against him.

On both grounds, therefore, the decree condemning the cargo should be affirmed.

*Mr. F. C. Brewster, of Philadelphia, contra, for the claimants of the cargo.*

1. *Was the cargo liable for attempted breach of the blockade?* It is a self-evident proposition that, in order to justify a seizure and condemnation of property as prize of war for breach of a blockade, the blockade must in point of fact be existing at the time of the seizure. And where the blockade has ceased before the capture is made, the penalty for a breach of blockade is held to be remitted. Now, the proclamation of May 12 was a revocation of the notification of blockade of the port of New Orleans; and on the first day of June, 1862, the blockade of that port ceased. The Josephine was captured *nearly two months afterwards.* Inasmuch as the *delictum* is done away when the blockade ceases,* and as this is the rule even where the blockade existed at the time the vessel sailed from the port, but ceased or was raised before the capture was made, how can the vessel and

---

* The Lisette, 6 Robinson, 387.

cargo in question be held liable to the penalty, for breach of blockade?

But if there was a breach of blockade, was it an intentional breach on the part of the owner of the cargo? The neutral must be chargeable with knowledge, either actual or constructive, of the existence of the blockade, and with an intent, and with some attempt to break it before he is to suffer the penalty of a violation of it.*

Though the cargo is always, *prima facie*, implicated in the guilt of the owner or master of the ship, its owner will, nevertheless, be permitted to give proof of the innocence of his intention. And, if this proof be satisfactory, the cargo will be adjudged to be free from the guilt in which the ship is involved, and be restored to its owner. In *United States* v. *Guillem,*† Taney, C. J., says: " Even in the case of a cargo shipped as a mercantile adventure, and found on board of a vessel liable to condemnation for a breach of blockade, although it is *primâ facie* involved in the offence of the vessel, yet, if the owner can show that he did not participate in the offence, his property is not liable to forfeiture." And the late Chief Justice of this court did here but declare what had been previously said, in the case of *The Exchange,*‡ by Sir William Scott: " Where orders had been given for goods," said the great English judge, "prior to the existence of a blockade, and it appeared that there was not time for countermanding the shipment afterwards, the court has held the owner of the cargo not responsible for the act of the enemy's shipper, who might have an interest in sending off the goods in direct opposition to the interest of his principal. And the same indulgence has been exercised where there was no knowledge of the blockade till after the ship had sailed, and the master, after receiving the information, obstinately persisted in going on to the port of his original destination."

In the present case, the owner of the cargo has established

* Fitzsimmons *v.* Newport Ins. Co., 4 Cranch, 185.
† 11 Howard, 62.                    ‡ 1 Edwards, 39.

the innocence of his intention.   The instructions given to Queyrouze by Laplante show that Laplante never designed any attempt to break the blockade.   On the contrary, he directed Queyrouze to keep the vessel and cargo at New Orleans until the opening of that port by the United States. Queyrouze followed these instructions, and detained the vessel after she had received her cargo, in port, until the act of the enemy deprived him of further control over her.   The affidavit of Queyrouze is explicit upon these points.

With the guilt of the vessel (if there be such guilt) we have nothing to do in this case.   We ask the court to discriminate between the vessel and her cargo.

To hold the owner of the cargo responsible in the way in which the captors wish, would be to put him completely in the power of the master; and, no matter how pure he may be, to make him bear the burden and suffer the penal consequences of a violation of the law which it was not in his power to prevent, and of which he never suspected the master would be guilty.

*As to the master's destruction of the mail containing letters.* The act of the master, in this respect, cannot operate to the injury of the owner of the cargo.   For, 1st, the carrying of a mere private mail—that is, one which does not contain *despatches* of the enemy—will not subject either the vessel or her cargo to seizure and confiscation.   And, 2d, even where the vessel carries despatches, and is seized in consequence thereof, the cargo will not share her fate where its owner or owners have not participated in the offence.   It cannot be pretended, in the present case, that either Laplante or Queyrouze was guilty of any such offence.   These letters were the only papers which the master destroyed.   He destroyed no papers concerning the ownership of the cargo, for he had none such with him.

2. *Was the cargo enemy's property?*

It was the property of Laplante, a French subject, who resided in his native country, and never had even a temporary residence in the South.   The affidavit of Queyrouze establishes this fact.   The presumptions of the master of the

captured vessel upon this point, cannot stand against the positive testimony of Queyrouze.

Nor can a hostile character be fastened upon it on account of the residence of Mr. Queyrouze, Laplante's agent, in New Orleans, while that city was in the possession of the rebels. For the rule is, that a neutral merchant may trade, in the ordinary manner, to the country of a belligerent, by means of a stationed agent there, and yet not contract the character of a domiciled person.*

The CHIEF JUSTICE delivered the opinion of the court.

It was held at the last term, by this court, that the blockade of the coast of Louisiana, having no direct connection with New Orleans by navigation, was not terminated by the discontinuance of the blockade of that port. In the cause now before us it is not very clearly shown by the evidence from what part of the coast the Josephine was coming when she was captured by the blockading steamer; but she must have been coming from some point west of Ship Shoal light, which is laid down on the Coast Survey charts as more than a hundred miles west of the mouths of the Mississippi. In this part, it seems, the coast may be reached from New Orleans, in some seasons at least, through the creeks and bayous which form a sort of network of water communication in Lower Louisiana, and allow more or less egress and ingress by small craft, to and from the Gulf. There does not appear to be any regular or usual communication with New Orleans from the Gulf by these ways. The Josephine succeeded in getting through, but the whole country through which she passed, and the coast where she came out, was in possession of the enemy; and she was captured by a blockader soon after she entered the Gulf.

It is impossible, under these circumstances, to hold that the blockade of that part of the coast was discontinued. That it was not discontinued in fact, is clearly shown by the evidence; and there was nothing in the occupation of the city, or in the proclamation revoking the blockade of the port

---

* The Anna Catharina, 4 Robinson, 107; The Indiana, 2 Gallison, 268.

of New Orleans which could work the legal termination of blockade of the coast which remained under hostile control.

We think that the blockade was in full force, and that the Josephine and her cargo were properly captured for violation of it. The appellant has filed an affidavit that the master of the Josephine was seeking the blockading fleet with the purpose of procuring a license to proceed on his voyage; but the statement of the master not only does not support the affidavit, but goes far to discredit it. Nor, indeed, could the alleged intent, if proved, avail the appellant; for it would not excuse the violation of the blockade.

This view makes it unnecessary to consider the questions made in the cause, respecting the ownership of the vessel and cargo, or the motion for further proof.

The decree of the District Court must be AFFIRMED.